AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Montana

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| A GRAY COLORED APPLE IPHONE, WITH NO MODEL OR IMEI NUMBER DISPLAYED, SEIZED FROM JAYLAN WASH | ) ) ) |

Case No. MJ-25-64-BU-KLD

**FILED**

NOV 03 2025

Clerk, U.S. Courts
District of Montana
Missoula Division

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A - incorporated herein by reference.

located in the _____ District of _____Montana_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B - incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. § 841(a)(1) | Distribution of Controlled Substances |
| Title 21 U.S.C. § 846 | Conspiracy to Distribute Controlled Substances |
| Title 21 U.S.C. § 843(a)(3) | Acquiring a Controlled Substance by Fraud and Forgery |

The application is based on these facts:
See attached affidavit in support of the search warrant application, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David B. Nutley, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Nov 3, 2025

_____
*Judge's signature*

City and state: Missoula, Montana

Kathleen L. DeSoto, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF A GRAY COLORED APPLE IPHONE, WITH NO MODEL OR INTERNATIONAL MOBILE EQUIPMENT IDENTITY NUMBER DISPLAYED, SEIZED FROM JAYLAN WASH | MJ 25-_64_-BU-KLD |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR
A WARRANT TO SEARCH AND SEIZE**

I, David B. Nutley, being first duly sworn, hereby depose and state as
follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the
Federal Rules of Criminal Procedure for a search warrant authorizing the
examination of property—an electronic device—which is currently in law
enforcement possession, and the extraction from that property of electronically
stored information described in Attachment B.   Based on the facts set forth in this
affidavit, I believe that this device has been used in furtherance of fraudulently
obtaining controlled substances and their subsequent distribution in violation of
21 U.S.C. § 843(a)(3), 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 846, that there is

1

probable cause to believe the search of the device will lead to evidence, fruits, and instrumentalities of the aforementioned crimes, as well as the identification of individuals who are engaged in the commission of those and related crimes.

2.    I am a Special Agent with the United States Drug Enforcement Administration (DEA) and have been since September 2012.  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and make arrests for criminal offenses, to include those enumerated in 18 U.S.C. § 2516.  My experience as a Special Agent includes conducting surveillance, interviewing witnesses, writing affidavits for and executing search warrants, and working with undercover agents and informants.  I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below.  I have participated in the investigations of numerous drug trafficking conspiracies, including Title III wiretaps.  As a result, I am familiar with matters, including the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs, and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.

3.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this

2

matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is described as a gray colored Apple iPhone, which does not display a model number or International Mobile Equipment Identity number, seized from Jaylan Javier Wash, hereinafter "Device." The Device is currently stored in DEA's Billings, Montana, evidence vault for storage and safekeeping.

5.      This warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

A. ARREST WARRANTS

6.      On August 27, 2025, a Grand Jury convened at the United States District Court for the District of Montana, Missoula Division, returned a true bill indicting Jaylan Javier Wash, among others, on violations of: Titles 21 U.S.C. § 846, conspiracy to possess with the intent to distribute oxycodone; Titles 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, possession with intent to distribute oxycodone; and Titles 21 U.S.C. §§ 843(a)(3), 846, and 18 U.S.C. § 2, use of fraudulent prescriptions to obtain controlled substances. The charges arose from a fraudulent scheme to

obtain controlled substances from pharmacies, perpetrated by Wash and his co-conspirators beginning in the District of Montana in August of 2023.

7.      On August 27, 2025, the Honorable Kathleen L. DeSoto, United States Magistrate Judge for the District of Montana, issued a warrant for Wash's arrest.

8.      Mary Ellen Johnson was also indicted in this same indictment and a summons was issued.  On September 24, 2025, DEA served Ms. Johnson with the summons, indictment, and notice via FedEx to her residence; Ms. Johnson received these documents on September 25, 2025.  On the same date, an attorney working with Ms. Johnson on a civil matter contacted Assistant United States Attorney (AUSA) Ryan Weldon to contest the identity of his client as being the individual who committed the offenses.  This attorney was subsequently provided a photograph from pharmacy surveillance footage, and he maintained his belief his client was not the person depicted in the pharmacy.  On September 26, 2025, Ms. Johnson contacted AUSA Weldon who added Diversion Investigator Aaron St. Peter to the phone call.  AUSA Weldon advised Ms. Johnson of her attorney-client privilege and her right to have an attorney present.  Ms. Johnson clarified that her attorney represented her in a civil matter and expressed her desire to discuss the indictment without an attorney present.  Ms. Johnson expressed her innocence and belief the woman depicted in the image was not her.  Ms. Johnson stated she was a victim of identity theft, which she experienced five to six years prior.  Since that time, Ms.

4

Johnson experienced multiple incidents of identity theft, including compromises with a financial institution and a cellular phone carrier. AUSA Weldon requested a few photographs of Ms. Johnson and informed her the charges against her would be dismissed. Later on the same date, Ms. Johnson provided several photographs of her.

9.      DI St. Peter and I conducted an additional review of the discovery, including surveillance photos and video, toll data, Amtrak records, and pharmacy records to determine whether Ms. Johnson was not the person who used fraudulent prescriptions in the pharmacies. In accordance with Montana Code Annotated § 37-7-410, seven pharmacies obtained and recorded Mary Johnson's driver's license information before dispensing the controlled substances. According to Illinois Secretary of State records, Mary Johnson surrendered her Massachusetts license when she was issued her Illinois license on April 3, 2023. Since that date, Mary Johnson did not report her Illinois license stolen to the Illinois Secretary of State. Based on the additional review of this evidence, DI St. Peter and I could not ascertain with absolute certainty whether Ms. Johnson was the individual who visited the pharmacies in Montana.

10.      On October 6, 2025, the United States Attorney's Office, with the approval of the Honorable Dana L. Christensen, United States District Court Judge for the District of Montana, dismissed the indictment against Mary Johnson.

5

11.    On September 24, 2025, DEA arrested Brandon Winfrey and Jaylan Wash in Dolton, Illinois, and Hammond, Indiana, respectively.  When each was independently informed of their arrest warrants from the District of Montana, both told me they had never been to Montana.  Wash later admitted to traveling to Montana.

B. JAYLAN WASH'S PHONE - THE DEVICE

12.    During DEA's investigation, Wash was found to be using a phone assigned call number (708) 668-2292.

13.    On September 2, 2025, I issued an administrative subpoena on T-Mobile requesting account information and toll data for (708) 668-2292.  I received the requested records on the same date and found the records did not list a subscriber. The account has been active since March 3, 2023.

14.    During this investigation, I submitted several administrative subpoenas to United Airlines, Delta Airlines, and American Airlines to identify Wash's travel. Wash frequently reported (708) 668-2292 as his phone number on his airline reservations.  Additionally, Wash listed email addresses jaylanwash2@icloud.com, sackchaserfrmda9@icloud.com, or sackchaserfrmda@gmail.com.

15.    On August 22, 2024, I served grand jury subpoenas on Airbnb, Inc., DoorDash, Inc., Lyft, Inc., and Uber Technologies, Inc.  I requested account

6

information associated with Wash, his date of birth, and his commonly used email addresses and phone numbers, including (708) 668-2292.

A)  Wash has four Airbnb, Inc. accounts in his name, each with a different phone number, but one which lists (708) 668-2292.  Wash's Airbnb, Inc. reservation in Bozeman, Montana, between December 7 and 9, 2023, used his name with (708) 668-2292.

B)  (708) 668-2292 was associated with a DoorDash, Inc. account using the name Tyler Wilkins with email address jaylanwash2@icloud.com and the Hammond, Indiana, address where Wash was arrested.  Another account used the name Jaylan Wash with the same Hammond, Indiana address, email address sackchaserfrmda9@icloud.com, and a different phone number.

C)  (708) 668-2292 was associated with a Lyft, Inc. account in the name of Tyler Wilkins with email address sackchaserfrmda@gmail.com, which appear to be variations of the registration details for the Wash accounts with DoorDash, Inc.

D)  (708) 668-2292 was associated with two Uber Technologies, Inc. accounts. The first used display name Tyler Wilkins with email address sackchaserfrmda9@icloud.com and the second used display name Buddy Ryan Coker with email address buddy08@yahoo.com.

7

16.     The records received revealed Wash used Airbnb, Inc. and DoorDash, Inc. during his travel to Montana. As these services are commonly used as phone applications on cell phones, I believe the Device will contain records of these visits to Montana and other travel to other locations in furtherance of the same fraudulent scheme.

C. ARREST

17.     On September 15, 2025, U.S. Magistrate Judge Kathleen L. DeSoto signed a search warrant authorizing the receipt of cell phone location information for Wash's (708) 668-2292 for a period of 30 days.

18.     On September 24, 2025, using the cell phone location information in conjunction with physical surveillance, DEA located and arrested Wash at his residence in Hammond, Indiana. While at the residence, DEA learned Wash slept on a futon in the common area of the residence. Wash's mother, Latriece Drake, provided consent to search the residence. In the common space, next to the futon, I observed an empty orange prescription pill bottle with the prescription label removed and two large baby bottles, which I know are commonly used for distribution of promethazine with codeine mixtures. Wash initially told investigators he threw his phone away, but later admitted it was on his mother's bed, where it was subsequently located and seized. During his post-arrest interview, Wash identified his phone number as (708) 668-2292.

8

D. <u>USE OF DEVICE</u>

19.    Through a review of records received in response to grand jury and administrative subpoenas, analysis of cell phone extraction reports, and interviews of arrested co-conspirators, DEA identified Wash as an individual who facilitated the Brandon Winfrey Drug Trafficking Organization's (Winfrey DTO) attempts to fraudulently obtain controlled substances from pharmacies. I believe Wash used the Device to coordinate travel, including airline reservations, Amtrak reservations, and Airbnb accommodations. Additionally, I believe Wash used the Device to communicate with co-conspirators to handle logistics for their travels.

20.    Airline records revealed Wash traveled to Montana on seven occasions between August and December 2023. DEA identified at least 64 fraudulent prescription attempts during Wash's visits to Montana. However, DEA did not identify any evidence, from surveillance video, pharmacy records, or interviews with pharmacy employees indicating Wash ever entered any of the pharmacies. Wash's role in the conspiracy indicates he drove the co-conspirators to each pharmacy and remained outside to watch for a law enforcement response. I believe the Device will provide additional insight into Wash's role while traveling to Montana and other locations visited by the Winfrey DTO.

21.    Airline records did not identify any additional travel to Montana after December 2023. However, airline records show Wash continued to travel with

Brandon Winfrey to other destinations, such as Norfolk, Virginia, and St. Louis, Missouri. On July 2, 2025, Wash was arrested in Vicksburg, Mississippi, after law enforcement was alerted to a fraudulent prescription attempt at one of their local pharmacies. Law enforcement traffic stopped a vehicle associated with the fraudulent prescription attempt and identified evidence associated with the fraudulent prescriptions. Wash was identified as the driver with two additional occupants. Wash was arrested and charged with Conspiracy to Commit a Crime, to wit: Prescription Forgery (Mississippi Code Annotated, § 97-1-1). A search warrant was obtained to search the vehicle and fourteen fraudulent prescriptions we located and seized, as well as a blank prescription sheets. Based on my knowledge of the investigation, I believe this arrest is consistent with Wash's role in the Montana fraudulent prescriptions. I believe the Device may contain evidence to show communications with co-conspirators, the coordination of the pharmacy visits, how Wash and the other occupants in the vehicle obtain the fraudulent prescriptions, and whether someone else, such as Winfrey, directs all of their actions.

E. CONCLUSION

22.    I have worked similar investigations where fraudulent prescriptions are filled by pharmacies. Through this experience, I found it is common for the fraudulent actors to work with at least one other person who remains inside a

10

vehicle in the parking lot or nearby. Through conversations with pharmacy employees and review of surveillance video, it is common for the person who dropped off the prescription to remain on their phone while in the store. I believe one person monitors the parking lot for a police response and remains in constant contact with the person inside the pharmacy.

23.    DEA's investigation found Wash remained outside of the pharmacies and was responsible for the transportation of the co-conspirators who entered the pharmacies to use the fraudulent prescriptions, and to watch for a law enforcement response to alert the person inside the pharmacy. Additionally, DEA's investigation found Wash likely used his phone to communicate with these co-conspirators and coordinate the logistics of their pharmacy visits.

24.    Through the review of seized cell phones, interviews of witnesses and arrested individuals, and subpoena responses, the DEA gleaned a significant understanding of how the fraudulent prescription attempts were perpetrated. However, as of this date, the DEA does not fully understand other aspects of the fraudulent prescription attempts, such as: how Wash obtained and/or created the fraudulent prescriptions; where Wash obtained the DEA registration numbers; and where or how the fraudulently obtained controlled substances are distributed. Through post-arrest interviews with arrested individuals from this organization and similar organizations, the DEA found the arrested individuals were not

11

provided this type of information to prevent them from divulging it to law enforcement if they're arrested.  I believe the Device offers an opportunity for the DEA to learn additional command and control aspects of Wash's involvement in the drug trafficking organization.

25.    Based on the discovery of the prescription pill bottle with the prescription label removed and two large baby bottles during Wash's arrest, Wash's July 2025 arrest involving the same fraudulent scheme, and DEA's investigation showing Wash potentially used the phone for travel-related services, such as Airbnb, Inc., I believe the Device will contain evidence of the conspiracy and identify the actions and roles of co-defendants in their efforts to fraudulently obtain controlled substances.  DEA's investigation identified over 1,800 oxycodone tablets were obtained by the use of the Winfrey DTO's fraudulent prescriptions in Montana.  This quantity, in conjunction with the fact the defendants reside out-of-state and therefore intended to leave Montana with the large quantities of controlled substances, indicates the oxycodone pills were obtained for subsequent distribution.  Based on my training and experience, I know cellular phones are commonly used to negotiate and coordinate drug transactions.  I therefore believe the Device will also contain evidence of the subsequent distribution of the controlled substances fraudulently obtained since August of 2023, through Wash's arrest in September 2025.

12

26.    I know from my training and experience that people engaged in criminal activity frequently utilize cellular phones to facilitate the crime of drug distribution and they contain evidence of the types described in Attachment B.    Specifically, cell phones are used to text and call associates, co-conspirators, and partners to facilitate drug distribution and payment for those substances and/or to conceal evidence of other crimes.  Address books and contact lists within cellular telephones often include the names, monikers, and contact information for individuals and businesses that are involved in criminal activity.    I also know that persons engaged in criminal activity often utilize different phones by removing the SIM card from one phone to another.  Cellular telephones are equipped with digital cameras, and therefore often contain photographs and videos, including photographs of contraband and narcotics as well as photographs of associates and business partners.  Further, cell phones have the capability to track and record location data which can reveal the movements of individuals engaged in drug trafficking.

## **TECHNICAL TERMS**

27.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send

13

signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system (GPS) technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include

14

various types of flash memory cards or miniature hard drives.  Most

digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data

unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or

iPod) is a handheld digital storage device designed primarily to store

and play audio, video, or photographic files.  However, a portable

media player can also store other digital data.  Some portable media

players can use removable storage media.  Removable storage media

include various types of flash memory cards or miniature hard drives.

This removable storage media can also store any digital data.

Depending on the model, a portable media player may have the ability

to store very large amounts of electronic data and may offer additional

features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to

display its current location.  It often contains records the locations

where it has been.  Some GPS navigation devices can give a user

driving or walking directions to another location.  These devices can

contain records of the addresses or locations involved in such

navigation.  The Global Positioning System (generally abbreviated

15

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-

processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet

17

traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28.   Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that these devices have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly,

18

things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

30.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices

19

were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32.  *Manner of execution.* Because this warrant seeks only permission to

20

examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
David B. Nutley
Special Agent, DEA

SUBSCRIBED and SWORN to before me on November 3, 2025.

_____
Kathleen L. DeSoto
U.S. Magistrate Judge

21